**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

FRANCIS TURNER,

        Plaintiff,

v.                                    Case No. 04-CV-70509-DT

OFFICER MATTHEW VIVIANO, et al.,

        Defendants.

_____/

**ORDER GRANTING DEFENDANTS' "MOTION TO DISMISS OR, IN THE
ALTERNATIVE, [MOTION FOR] SUMMARY JUDGMENT"**

      Pending before the court is Defendants' "Motion to Dismiss Or, In the Alternative,
[Motion For] Summary Judgment." This motion has been fully briefed and the court held
a hearing in this matter on April 6, 2005. For the reasons stated below, the court will
grant Defendants' motion.

**I. BACKGROUND**

      On August 11, 2003 at 3:47 p.m., Defendant Hazel Park Officer Matthew Viviano
received a dispatch call to Value Carpet at 1543 Eight Mile Road for an armed robbery.
(Viviano Dep. at 32-33.) The dispatch described the suspect as a "black male, five foot
seven, wearing a gray t-shirt and dark shorts." (*Id.* at 36.) Viviano also received
information that the suspect fled southbound on Riopelle, a street just south of Eight
Mile Road, across from the carpet store. (*Id.* at 35.) Viviano located Plaintiff in front of
20021 Riopelle and decided to approach him because he believed that Plaintiff matched
the suspect's description. (*Id.* at 44.) Plaintiff Francis Turner alleges that Defendant
Officers Matthew Viviano, Sean Boucher, Jason Pence, Joseph Lowry, and Sargeant

Martin Barner arrested him without probable cause and that Defendant Viviano approached him, and "verbally and physically assaulted him, and used excessive and brutal force" against him.  (*Id*. at ¶¶ 7, 9.)  Plaintiff further alleges that Defendant Viviano "assaulted and battered [him], grabbed him in the neck, choked him, and dragged him." (*Id*. at ¶ 10.)  After Defendant Viviano allegedly engaged in this conduct, he called for back up from the Hazel Park police department.  (*Id*. at ¶ 11.)   Plaintiff asserts that the officers "simultaneously, choked him, struck him, and at least one Defendant [o]fficer struck him against an automobile."  (*Id*. at ¶ 13.)  Plaintiff also claims that at least one officer used a racial epithet, but only in his communication with Plaintiff's brother, Mr. Frank Turner, after Frank Turner "told the officer he did not have to bang Francis'[s] head into the car."  (Pl.'s Resp. at 4.)

Plaintiff was examined at St. John Hospital for his complaints - chiefly a sore back – but the observed injuries consisted only of a contusion and an abrasion and swelling of his left arm. (Pl.'s Resp. at 11; Ex. D.)

Plaintiff brings the following causes of action against Defendants: Assault and Battery, Fourth Amendment claims against the City of Hazel Park and Defendant officers brought pursuant to 42 U.S.C. § 1983, Violation of the Michigan Constitution claims against the City of Hazel Park and Defendant officers, False arrest/imprisonment, Failure to Train, conspiracy claims against Defendant officers brought pursuant to 42 U.S.C. §§ 1983 and 1985, Gross Negligence, and Intentional Infliction of Emotional Distress.  (Pl.'s Am. Compl. at ¶ 16.)

2

## II.  STANDARDS

### A.  Fed. R. Civ. P. 12(b)(6)

In ruling on a motion to dismiss under Rule 12(b)(6), the court must construe the complaint in a light most favorable to the plaintiff, accept all the factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief.  *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996); *Kline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996); *Wright v. MetroHealth Med. Ctr.*, 58 F.3d 1130, 1138 (6th Cir. 1995).  When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir. 1993); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  Hence, a judge may not grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations.  *Wright*, 58 F.3d at 1138; *Columbia Natural Resources, Inc.*, 58 F.3d at 1109.

Though decidedly liberal, this standard of review does require more than the bare assertion of legal conclusions.  *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996); *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1100-01 (6th Cir. 1995).  The complaint should give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994).  "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'"  *Lillard*, 76 F.3d at 726 (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)).  "In determining

3

whether to grant a Rule 12(b)(6) motion, the court primarily considers the allegations in the complaint, although matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint also may be taken into account." *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (emphasis omitted) (citing *Nieman v. NLO, Inc.*, 108 F.3d 1546, 1554 (6th Cir. 1997)).

### B. Fed. R. Civ. P. 56

Under Federal Rule of Civil Procedure 56, summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). The existence of some factual dispute, however, does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material. *See id.* at 252 ("The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.'"). A fact is "material" for purposes of summary judgment when proof

4

of that fact would have the effect of establishing or refuting an essential element of the claim or a defense advanced by either party. *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984).

In considering a motion for summary judgment, the court must view the facts and draw all reasonable inferences from the admissible evidence presented in a manner most favorable to the nonmoving party. *Dunigan v. Noble*, 390 F.3d 486, 492 (6th Cir. 2004) ("we must determine 'not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it upon whom the *onus* of proof is imposed.'") The court does not weigh the evidence to determine the truth of the matter, but must determine if the evidence produced creates a genuine issue for trial. *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003.

### III.  DISCUSSION

### A.  Plaintiff's 42 U.S.C. § 1983 Claims Against the City of Hazel Park[1]

Because Plaintiff cannot rely on *respondeat superior* to hold the City of Hazel Park liable under 42 U.S.C. § 1983 for the injuries he allegedly suffered from City police officers, *see Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978), he must establish that the city's official policies or customs (or lack thereof) were a "moving force" behind the deprivation of Plaintiff's rights and arose as a result of "deliberate

---

[1] In his amended complaint, Plaintiff brought multiple claims under the Michigan Constitution that in large part mirror his federal claims. The court notes that in *Jones v. Powell*, 612 N.W.2d 423 (Mich. 2000), the Michigan Supreme Court held that, inasmuch as other avenues of relief are available, there is no "damages remedy for a violation of [the Michigan] Constitution . . . against a municipality, or an individual government employee." *Id.* at 426.

5

indifference" to his rights. *See Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir.

1996).

   In *City of Canton v. Harris*, 489 U.S. 378 (1989), the Supreme Court held that:

   the inadequacy of police training may serve as the basis for § 1983 liability
   *only where the failure to train amounts to deliberate indifference* to
   the rights of person with whom the police come into contact . . . . Only
   where a failure to train reflects a *'deliberate' or 'conscious' choice by a
   municipality*--a 'policy' as defined by our prior cases--can a city be liable
   for such a failure under § 1983.

*Id.* at 388-89 (emphasis added). The *City of Canton* Court further explained its

conception of "deliberate indifference" in the context of municipal liability by adding that:

   The issue in a case like this one . . . is whether [the] training program is
   adequate; and if it is not, the question becomes whether such inadequate
   training can justifiably be said to represent city policy. It may seem
   contrary to common sense to assert that a municipality will actually have a
   policy of not taking reasonable steps to train its employees. But it may
   happen that in light of the duties assigned to specific officers or employees
   the need for more or different training *is so obvious, and the inadequacy
   so likely to result in the violation of constitutional rights*, that the
   policymakers of the city can reasonably be said to have been deliberately
   indifferent to the need.

*Id.* at 390 (emphasis added). In sum, "deliberate indifference is a stringent standard of

fault, requiring proof that a municipal actor disregarded a known or obvious

consequence of his action." *Bd. of County Commissioners of Bryan County v. Brown*,

520 U.S. 397, 410 (1997).

   To establish liability under *City of Canton,* "the plaintiff must prove . . . (1) that the

training program at issue is inadequate to the tasks that officers must perform; (2) that

the inadequacy is the result of the city's deliberate indifference; and (3) that the

inadequacy is 'closely related to' or 'actually caused' the plaintiff's injury.'" *Russo v. City

of Cincinnati,* 953 F.2d 1036, 1046 (6th Cir. 1992) (quoting *Hill v. McIntyre,* 884 F.2d

6

271, 275 (6th Cir. 1989)).  In addition, the focus of the court's inquiry is on the training program itself and testimony that shows individual officers did not have specific training, standing alone, is insufficient to defeat summary judgment.  *Carey v. Helton*, 70 Fed. Appx. 291, 2003 WL 21525115, at *3 (6th Cir. July 2, 2003) (officer testimony and conclusory proposed expert opinion insufficient to create issue of fact that training program showed deliberate indifference to potential excessive force against mentally ill detainees).  "That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program."  *City of Canton,* 489 U.S. at 390-91. Moreover, it is not enough for a plaintiff to show that his injury could have been avoided if the officer had more or better training.  *Mayo v. Macomb County*, 183 F.3d 554, 558 (6th Cir. 1999).

In his amended complaint, Plaintiff claims that "Defendant City of Hazel Park, by its own customs, policies, and/or practices of failing to properly train, evaluate, supervise, investigate, review, and/or discipline its police officers, allowed Defendants to function as police officers, allowed Plaintiff . . . to be subjected to violation of his Constitutional rights and acquiesced in these Defendants' conduct, which grossly negligently, recklessly, willfully, wantonly, knowingly, deliberately[,] indifferently, and/or intentionally violated Plaintiff's rights, privileges and/or immunities under the U.S. Constitution."  (Pl.'s Am. Compl. at ¶ 38.)

In their "Motion to Dismiss . . . ," Defendants assert that Plaintiff cannot "demonstrate an established pattern or policy of unconstitutional activity."  (Defs.' Mot. at 1.)  The court agrees.  Plaintiff has not directed the court to admissible evidence that

7

supports a finding that the City of Hazel Park has an official policy of unconstitutional activity or improper training or that its conduct rose to the level of deliberate indifference.  All of Plaintiff's evidence relates to the incident at issue in the instant case. Evidence of an isolated incident of unconstitutional activity does not establish a municipality's deliberate indifference.  *Molton v. City of Cleveland*, 839 F.2d 240, 244-45 (6th Cir. 1988).

In his response brief, Plaintiff argues that Defendant Hazel Park does not have a policy that prohibits choke holds or violently slamming the head/face area of an individual into the side of a vehicle.  (Pl.s' Resp. at 7.)  However, Plaintiff presents no admissible evidence that describes the nature of Defendant City of Hazel Park's law enforcement policy.  The only evidence presented by Plaintiff that is remotely related to the issue of a city policy governing police conduct is found in Defendant Sargeant Martin Barner's deposition testimony.  In his deposition, Barner was asked if it is "ever reasonable to slam a suspect against a vehicle."  (Barner Dep. at 17.)  Barner responded that "if I was fighting with somebody, yeah, I think it's reasonable to protect my life and someone else's, it's very reasonable." (*Id.*)  Barner clarified his answer by stating that if he is "being choked or someone else is being choked or at knife point or fighting with [him], kicking [him], [he] will do what [he has to] to stop that person's actions.  And that would include up to slamming them against the car."  (*Id.* at 18.) Barner was then asked the same question in relation to a handcuffed suspect.  (*Id.*) Barner testified that "you may take [the handcuffed suspect] to the ground to prevent them from kicking or spitting on you."  (*Id.*)  In addition, Barner testified that he would not slam a suspect against a car when he is handcuffed.  (*Id.*)  When asked "what about

8

if they're of a different ethnicity from you, would you call them any racial epithets?,"
Barner responded "absolutely not." (*Id.*)  Barner also stated that he is not sure if calling
a person of a different ethnicity a racial epithet is explicitly prohibited by Hazel Park's
policy, "but that is not what you do."  (*Id.*)

Plaintiff argues that Barner's testimony suggests that he "seemingly authorized,
approved, or knowingly acquiesced in the unconstitutional conduct of the other
Defendant Officers who were [his] subordinates."  (Pl.'s Resp. at 24.)  The court cannot
agree with Plaintiff's logic in this regard.  Plaintiff's evidence merely shows that
Sargeant Barner *acknowledges* that when he or another officer is facing a threat from a
suspect, slamming that person against a vehicle *might* be appropriate under some
circumstances and that an officer *may*, under certain circumstances, properly take a
suspect to the ground to prevent him from kicking or spitting on an officer.  The
questions presented to Defendant Barner do not begin to encompass the numerous
factors that police officers must consider in effecting a stop, including whether a suspect
is resisting, whether he has a weapon, and how he might be using such a weapon or
resisting.  The unending potential factual scenarios that officers may face in confronting
a suspect, evident in Sargeant Barner's statement, cannot be ignored.

Plaintiff has failed to present evidence that rises to the level of attributing
deliberate indifference to constitutional rights by the City of Hazel Park.  Plaintiff has
also failed to present evidence of a lack of training in this regard, or that any of the

9

customs, practices, or procedures of the municipality were the moving force behind the alleged unconstitutional conduct in this case.

Defendants' motion for summary judgment on Plaintiff's § 1983 claim is granted as to the City of Hazel Park.

### B. Plaintiff's 42 U.S.C. § 1983 Claims Against The Individual Defendants

#### 1. Seizure

The preliminary question that must be addressed in evaluating Plaintiff's § 1983 claims against the Defendant officers in their individual capacities is whether the seizure of Plaintiff was lawful.

#### a. *Terry* Stop

Plaintiff alleges that "at all material times, Plaintiff . . . had the right under the U.S. Constitution and 42 U.S.C. Section 1983, to be protected from deprivation of his liberty, unreasonable intrusion on his person without due process of law, and violation of First Amendment rights, by persons acting under the color of law."[2]  (Pl.'s Am. Compl. at ¶ 34.)

Officers are permitted to briefly stop an individual for investigative purposes if they have "reasonable suspicion" that the individual committed a crime.  *United States v. Palomino*, 100 F.3d 446, 449 (6th Cir. 1996).  Reasonable suspicion includes

---

[2] Section 1983 does not create substantive rights; it merely serves as a vehicle to enforce deprivations of "rights[,] privileges, or immunities secured by the Constitution and laws [of the United States]."  *Oklahoma City v. Tuttle*, 471 U.S. 808 (1985); *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002) ("§ 1983 merely provides a mechanism for enforcing individual rights 'secured' elsewhere, *i.e.*, rights independently 'secured by the Constitution and laws' of the United States"); *Chapman v. Houston Welfare Rights Org.*, 441 U.S. 600, 617 (1979) ("One cannot go into court and claim a 'violation of § 1983'-- for § 1983 by itself does not protect anyone against anything.").

specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant an investigatory stop.  *Terry v. Ohio*, 391 U.S. 1, 21 (1968).

Officer Viviano testified during his deposition (and there is no dispute) that "[his] dispatch sent out a call to Value Carpet at 1543 Eight Mile Road on an armed robbery with a gun implied."  (Viviano Dep. at 33.)  The dispatch described the suspect as a "black male, five foot seven, wearing a gray t-shirt and dark shorts."  (*Id.* at 36.)  Officer Viviano also received information that the suspect fled southbound on Riopelle, a street just south of Eight Mile Road, across from the carpet store.  (*Id.* at 35.)  Once he received the dispatch call, Viviano "started for that location."[3]  (*Id.* at 33.)

According to Defendants, Officer Viviano:

saw someone matching the description of the suspect, standing outside a home on Riopelle, and approached the individual, later identified as Plaintiff, to speak with him, intending to temporarily detain him for questioning.  When [Plaintiff] attempted to flee, the officer physically restrained him, first by holding onto him, and when it became clear that Plaintiff would continue to resist and pull away, the officer, with assistance of Officer Lowry, handcuffed [Plaintiff] and placed him momentarily, in a police vehicle until he could be identified, or eliminated as a suspect.

(Def.'s Mot. at 2; Viviano Dep. at 46.)  Plaintiff (a Black male) testified during his deposition that on the day in question he was "wearing a gray shirt, some black pants, some gym shoes - - not black pants, black shorts."  (Plaintiff's Dep. at 35.)  Plaintiff also stated during his deposition that he was 5'4".  (*Id.*)  There is no material discrepancy between Plaintiff's self-description and the dispatch description.

---

[3] Viviano did not actually see the perpetrator of the armed robbery fleeing nor was any name of the suspect conveyed as part of the dispatch.  (Viviano Dep. at 35-36.)

Based on the undisputed evidence, the court finds that there is no genuine issue of material fact as to Officer Viviano's reasonable suspicion to effectuate a *Terry* stop when he viewed Plaintiff standing outside of the home on Riopelle.  Plaintiff very closely matched the description of the suspect described over the police dispatch and he was located in close temporal proximity to the alleged armed robbery.

When circumstances warrant precautions such as handcuffing the person detained, officers do not exceed the bounds of a *Terry* stop by doing so.  *Houston v. Clark County Sheriff Deputy John Does* 1-5, 174 F.3d 809, 814-15 (6th Cir. 1999) (a detention in a police cruiser does not automatically transform a *Terry* stop into an arrest); *United States v. Stewart*, 388 F.3d 1079, 1084 (7th Cir. 2004).  In this case, all witnesses agree, and there is therefore no issue of fact, that Plaintiff engaged in a struggle with Officer Viviano and that Plaintiff was handcuffed in an effort to restrain him.  (Frank Turner Dep. at 10; Kendall Dep. at 12.)  Based on the undisputed evidence, a reasonable jury could conclude only that Defendant Viviano had a reasonable basis to think that Plaintiff fit the description of the man who committed the reported armed robbery; the officers did not exceed the bounds of a *Terry* stop in their detention of Plaintiff.

### b.  Arrest

The Fourth Amendment requires probable cause for an arrest or seizure of free citizen, such as Plaintiff.  *See Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003).  Under federal law, "probable cause to arrest and prosecute is based on the 'facts and circumstances within the officer's knowledge that are sufficient to warrant a

12

prudent person . . . in believing . . . that the suspect has committed, is committing, or is about to commit an offense.'" *Hinchman v. Moore*, 312 F.3d 198, 204 (6th Cir. 2002) (quoting *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988)).  Courts are required to look at this question through the lens of a reasonable officer on the scene, "rather than with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001).

Even if the seizure of Plaintiff evolved into an arrest, the undisputed evidence detailed above supports a finding only that Defendants had probable cause necessary to arrest Plaintiff.  Plaintiff's close physical match to the description of the person said to have committed the armed robbery, his proximity to the location of the robbery, his immediate resistance to the officer's inquires and his attempted flight upon the officer's closer approach, supports a finding that a reasonable officer in Defendants' position would have concluded that probable cause existed to arrest Plaintiff for the armed robbery.  Therefore, whether Plaintiff's detention comprised a *Terry* stop or an arrest, there is no issue of fact that his seizure was reasonable under the Fourth Amendment.

## 2.  Excessive Force

At the outset, it is necessary to clarify the nature of Plaintiff's claims related to excessive force.  Plaintiff's complaint specifies the Fourteenth Amendment, not the Fourth, as the source of Plaintiff's claim.  Defendants' motion highlighted this aspect of the case.  In their motion, Defendants state that "Plaintiff has failed, entirely, to plead a Fourth Amendment cause of action.  Nowhere in his Amended Complaint is the Fourth Amendment even mentioned."  (Def.'s Mot. at 5.)

The point was emphasized by Defendants' counsel at oral argument as well:

13

Interesting, the plaintiff didn't plead a Fourth Amendment claim, and I pointed that [out] in my brief, and didn't request leave for the court to amend his complaint to add a Fourteenth [sic: Fourth] Amendment claim.

(Hr'g Tr. at 10.)

Inquiring about that point with Plaintiff's counsel, the court at oral argument

asked:

THE COURT:  Okay.  All right.  Well, what else? We're talking here about Fourteenth Amendment?

MR. WYRICK:  Correct.

THE COURT:  It is a Terry stop.  It is a legitimate Terry stop based on all of the evidence that I've seen.  A Fourteenth Amendment analysis applies which requires actions that shocked the conscience, defined as actions undertaken, not for the purpose of maintaining or restoring order or engaging in other lawful investigatory pursuits, but more likely for the purpose of sadistic infliction of pain or punishment or something along those lines.

MR. WYRICK:  That is correct, Your Honor.  We agree.

(*Id.* at 37.)

Analyzing the issue under the Fourteenth Amendment is, however, not correct.

Although Plaintiff pleads his excessive force claim under the Fourteenth Amendment,

"*all* claims that law enforcement officers have used excessive force–deadly or not–in the

course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be

analyzed under the Fourth Amendment and its 'reasonableness' standard."  *Graham v.

Connor*, 490 U.S. 386, 395 (1989).  (Emphasis supplied.)

### a.  Fourth Amendment

Determining whether the force used to make a particular seizure is reasonable

under the Fourth Amendment "requires a careful balancing of the nature and quality of

the intrusion on the individual's Fourth Amendment interests against the countervailing

14

governmental interests." *Graham*, 490 U.S. at 396. "Courts must apply an objective standard, looking to 'the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect pose[d] an immediate threat to the safety of the officers or others, and (3) whether he was actively resisting arrest or attempting to evade arrest by flight.'" *Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (quoting *Graham*, 490 U.S. at 396). Further, evidence related to the severity of a plaintiff's injuries may be relevant in determining the amount of force used. *Martin v. Heideman*, 106 F.3d 1308, 1311-12 (6th Cir. 1997) (error to limit "evidence of the severity of [Plaintiff's] injury," as the Supreme Court's reference to the "nature and quality of the intrusion" in *Graham* "must include consideration of the severity of any injury inflicted").

Courts assess the reasonableness of an officer's conduct from the perspective of a reasonable officer on the scene, not *ex post* with the benefit of 20/20 hindsight. *Graham*, 490 U.S. at 396. The court's reasonableness calculus allows "for the fact that police officers are often forced to make split-second judgments--in circumstances that are tense, uncertain, and rapidly evolving--about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 397. The right to make a lawful seizure "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id.* at 396. "Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers . . . violates the Fourth Amendment." *Id.* Totally gratuitous uses of force, however, may be excessive. *Gaddis,* 364 F.3d at 772 (citing *McDowell v. Rogers*, 863 F.2d 1302, 1307 (6th Cir. 1988)). In addition, the subjective intentions of the officer involved are not relevant to whether the force used was

15

reasonable. *Graham*, 490 U.S. at 397.

The evidence shows that the circumstances under which Plaintiff was seized were tense and progressed quickly. Plaintiff was suspected of having just committed an armed robbery. Moreover, a crowd had gathered at the scene and began shouting at the officers, and one member of the crowd attempted to spray water on the officers. (Lowry Dep. at 18; Kendall Dep. at 16.)

Officer Viviano testified that he told Plaintiff that there had just been "an armed robbery across the street and due to the fact that Mr. Turner is roughly five foot seven and due to the fact that he's wearing a gray T-shirt and dark shorts, that description that was given out as the suspect that fled southbound, [he] explained to him that he matched the description and that [they] would have the victim come down just for a rough show-up." (Viviano Dep. at 46.) Plaintiff does not contradict this testimony. Viviano testified that Plaintiff "didn't agree to [his] questioning. He was aggressive and hostile from the beginning." (*Id.* at 46-47.) Plaintiff does not disagree. Viviano also testified that he grabbed Plaintiff's arm as he was stepping away from him. (Viviano Dep. at 47.) Again Plaintiff does not disagree.

A neighbor, Brenda Kendall, testified that Plaintiff "was tussling with [the officer] and trying to pull back from the officer as [Plaintiff] was tussling and all." (Kendall Dep. at 12.) To "tussle" is "to pull or push about roughly, to hustle; to struggle or contend roughly with . . . ." *Oxford English Dictionary,* 2d Edition. Kendall accordingly confirms the officer's testimony that Plaintiff was aggressively resisting. Kendall also testified that the officer had both hands on Plaintiff's shoulder or pectoral region and his upper torso while standing directly in front of him. (*Id.* at 12.) Plaintiff's brother, Frank Turner,

16

stated that the two "[were] fumbling." (Frank Turner Dep. at 10.) Officer Viviano stated

that he grabbed one of Plaintiff's arms as he was "stepping away from [him]" and

described Plaintiff as "aggressive and hostile from the beginning." (Viviano Dep. at 46-

47.)

Officer Lowry testified in his deposition that "a young [black] lady was shooting

[the officers] with water [from] a hose." (Lowry Dep. at 18.) From Plaintiff's witnesses

there is no direct disagreement. Kendall testified that Plaintiff "had the water hose in

front of him . . . ." (Kendall Dep. at 12) and that she "had heard that one of the young

ladies picked up the water hose." (*Id.* at 17.) Lowry, like the other witnesses, testified

that when he arrived there was a struggle between Officer Viviano and Mr. Turner.

(Lowry Dep. at 20.) Officer Lowry stated that "they were clutching, [and] grabbing at

each other" and "it was a matter of [him] walking up telling the two individuals to step

back, and then assisting Officer Viviano in handcuffing [Plaintiff]." (*Id.* at 20-21.) Officer

Lowry further described the scene as "chaos," and stated that they were "getting

sprayed with water and [that] everybody [was] yelling and cursing and swearing, and

Mr. Turner [was] cursing and swearing at us and telling us what he was going to do, you

know." (*Id.*) Officer Lowry testified that at no point did he see Officer Viviano strike Mr.

Turner or Mr. Turner strike Officer Viviano after he arrived. (*Id.* at 22.) Officer Boucher

also testified that at no point did he observe Officer Viviano or Officer Lowry strike

Plaintiff. (Boucher Dep. at 42.)

Kendall stated that, in her opinion, "it was aggressive force that I saw this officer

use on [Plaintiff]. It almost – this is the honest-to-God truth. It almost brought me to

tears, because I just couldn't believe what was going on was happening." She, of

17

course, is not an expert in matters concerning the use of force by law enforcement officials and there is no basis preferred for the admission of such opinion testimony. Nor does Kendall explain in her testimony what aspect(s) of Viviano's actual conduct constituted the "aggressive force" she perceived. (Kendall Dep. at 16.) Kendall's statement amounts to conclusions, i.e., her opinion, as her testimony is devoid of any detail or description of the nature of the actual force that she observed the officer use.

Plaintiff's brother, Frank Turner, testified that the officer "was trying to get [Plaintiff] off his feet. [Plaintiff] was trying to stand his ground. If the officer was strong enough, he would have picked him up, but he couldn't." (Frank Turner Dep. at 11.) This description is not inconsistent with the testimony of the officers, including Viviano, that they were trying to restrain Plaintiff at that time.

Plaintiff's mother, Sheila Turner, testified that the "police officer had [Plaintiff] in a choke hold and he was pulling the neck part of his sweater, his T-shirt." (S. Turner Dep. at 38.) She stated that the officer "was choking him, but he was still trying to pull the shirt." (*Id*.) Turner stated that she "walked up and . . . took Francis's hand . . . and just held his hands, but the cop still had him in the choke hold." (*Id*. at 41.)

It is clear enough from the undisputed evidence that the officer had hold of Plaintiff in some manner, perhaps including around the neck, and was trying to restrain him. However, a lay witness's use of the phrase "choke hold" to describe the action does no more than say that Plaintiff was held around the neck. It does not demonstrate that the officer was actually using the police technique known as "choke-hold," also called a "carotid hold." This restraint maneuver was detailed by the Supreme Court:

In the "carotid" hold, an officer positioned behind a subject places one arm

18

around the subject's neck and holds the wrist of that arm with his other hand. The officer, by using his lower forearm and bicep muscle, applies pressure concentrating on the carotid arteries located on the sides of the subject's neck. The "carotid" hold is capable of rendering the subject unconscious by diminishing the flow of oxygenated blood to the brain.

*City of Los Angeles v. Lyons* 461 U.S. 95, 98, note 1 (1983).

Commonly associated with the use of a "choke-hold" is the infliction of some kind of injury, including sometimes fatal injury, or at least the result of rendering the subject unconscious. *Magrum v. Meinke*, 332 F.Supp.2d 1071, 1080 (N.D. Ohio 2004) (Expert doctor testified that "ecchymosis, or bruising, up near the shoulder and above, might indicate that Plaintiff suffered a neck injury . . . . [T]he aforementioned muscle strain could be 'consistent with being choked and thrown on the ground.'"); *Fultz v. Whittaker*, 261 F.Supp.2d 767, 773 (W.D. Ky. 2003) (Where Plaintiff's neck was broken in scuffle with police, "Plaintiff's medical expert, Dr. David Changaris [asserted] that Plaintiff's neck injury is consistent with a factual scenario in which a person is restrained from the back by a choke hold or neck restraint and the restraining party exerting a jerk or force to the neck area."); *Id.* at 777 ("Evidence of injury to the anterior neck from the reported choke hold such as petechial hemorrhage (rupture of the small blood vessels in the neck), bruising to any area of the neck, and complaints of difficulty swallowing or breathing . . . would normally be present if a 'choke hold' had been applied.") *See also* *Nielsen v. Clayton* 62 F.3d 1419 (table) at *3 (7th Cir. 1995) (Witness "saw Clayton [a mental health center employee] drag Nielsen [a mental health center resident] by the neck, in a choke-hold, while Nielsen was hanging limply without movement . . . . Nielsen had received injuries to his neck, including a hemorrhage, within twenty-four hours prior to his death . . . . [T]he use of a choke-hold can cause such injuries.")

19

In this case there is no evidence that Plaintiff was, in fact, subjected to a choke-hold. No testimony is presented that supports the complaint's "choking" allegations. Even accepting for argument that Plaintiff may have felt choked (or been subjected to a choke-hold) at some point in the struggle, there is still no evidence that officers used excessive force in doing so. The court has seen no evidence that Plaintiff said he passed out, or felt close to doing so, while in the officers' grasp, and no claim by Plaintiff or other evidence that he experienced any sort of injury to his neck or the surrounding area. *Martin,* 106 F.3d at 1311-12 (court considers "severity of any injury"); *cf. Baskin v. Smith,* 50 Fed., Appx. 731, 736-37 (6th Cir. 2002) (extent of injury not "crucial" to determination of excessive force.)  In the testimony of one lay witness the court finds the phrase "choke-hold" used to describe the events, but the mere intoning of a phrase does not establish a genuine issue of fact that excessive force was used.  On the evidence presented and detailed above, a reasonable jury could conclude only that Officer Viviano was attempting to restrain Plaintiff while, as the undisputed evidence also shows, Plaintiff fought and refused to submit to attempts to detain him.

Plaintiff was thereafter observed at St. John Hospital, and his injuries consisted only of a contusion (i.e., a bruise) and an abrasion and swelling of the left forearm. (Pl.'s Resp. at 11; Ex. D.)  Plaintiff complained of pain, but only in his back and on his side, and all examinations were noted as "normal," including his back, his neck (which was "normal" and "supple"), his head and scalp. (*Id.*) The injuries detailed in the St. John examination report are trivial. They are also undisputed by any other evidence and not in any way indicative of excessive force. *Martin,* 106 F.3d at 1312.

No reasonable jury could find Officers Viviano's and Lowry's actions to have

20

been unreasonable or the force used to have been excessive. The only conclusion a reasonable jury could reach is that their actions were taken to restrain an identified robbery suspect and to restore order to an explosive and chaotic situation.  The evidence does not support a finding that Defendants' actions violated Plaintiff's Fourth Amendment rights.

The court will grant Defendants' motion for summary judgment as to Plaintiff's § 1983 claim against the individual Defendants as there is no issue of fact that Defendant Officers did not use excessive force in violation of the Fourth Amendment.

### 3.  Individual Defendant Officers and Qualified Immunity

Generally, public officials performing discretionary functions are entitled to qualified immunity and are protected from defending a § 1983 action when their conduct does not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Whether qualified immunity attaches to an officer's conduct is a legal question, to be determined by the judge prior to trial.  *Walton v. City of Southfield*, 995 F.2d 1331, 1335 (6th Cir. 1993).

The Supreme Court in *Saucier v. Katz*, 533 U.S. 194 (2001), established a two-part inquiry.  First, a court must decide whether the alleged facts, taken in the light most favorable to the injured party, establish the violation of a constitutional right.  *Id*. at 201. If a constitutional right is not implicated, the inquiry ends and the official is entitled to qualified immunity.  *Id*.  If, however, a constitutional right is implicated, the next inquiry is "whether the right was clearly established."  *Id*.  This examination "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Id*.

21

Furthermore, "the contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right." *Saucier*, 533 U.S. at 202 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.*; *see Wilson v. Layne,* 526 U.S. 603, 615 (1999). It is not necessary, however, "that the very actions have been previously held unlawful but, given the preexisting law, the unlawfulness of the conduct must have been apparent." *Barton v. Narrod*, 106 F.3d 1289, 1293 (6th Cir. 1997) (citation omitted).

Even when taking the facts in a light most favorable to Plaintiff and drawing reasonable inferences from the admissible evidence presented, the Defendant Officers' use of force did not cross the "hazy border between excessive and acceptable force." *Saucier*, 533 U.S. at 206 (quoting *Priester v. Riviera Beach*, 208 F.3d 919, 926-27 (11th Cir. 2000)).

Plaintiff alleges that the "Defendant Officers acted unreasonabl[y] and in bad faith. For instance, Officer Viviano failed to thoroughly investigate. Officer Viviano acted extremely unreasonably in violently assaulting, choking, dragging, grabbing, and striking [Plaintiff]." (Pl.'s Resp. at 15.) However, the undisputed, sworn testimony shows that Plaintiff engaged in a fight with the Defendant officers. In addition, in his deposition, Defendants' counsel asked Plaintiff if any officer besides Viviano, the backup officer, or the third officer who put handcuffs on him touched him in "any way that [he] believe[d] was wrong or improper." (Pl.'s Dep. At 66.) Plaintiff responded "No ma'am." (*Id.*) Defendants' counsel also asked Plaintiff "if any other police officers on the scene [said] anything to [him] that [he] believe[d] was wrong or improper." (*Id.*)

22

Plaintiff responded "No, ma'am."  (*Id.*)  Because the court finds that there is no genuine

issue of fact showing that the Defendant officers engaged in unconstitutional activity,

the court need not engage the second part of the qualified immunity analysis: whether

defendants should have been aware that their conduct was unlawful.

### 4.  First Amendment

Plaintiff also asserts that the Defendant Officers violated his First Amendment

rights when they "retaliated against his use of protected speech."  (Pl.'s Am. Compl. at

¶ 35.)  Plaintiff further states that Defendants "retaliated against [him] for his exercise of

First Amendment rights to make complaints/grievances."  (*Id.* at ¶ 36.)  "It is

well-established that arresting or detaining an individual in retaliation for criticizing the

police, even through the use of crude language, violates the First Amendment."  *Cohen*

*v. Smith*, 2003 WL 343235, *5 (6th Cir. 2003).

Plaintiff has not identified admissible evidence that supports a finding that his

First Amendment rights were violated.  Plaintiff has not identified what protected speech

he uttered that the Defendant officers attempted to quash nor explained in what way he

was retaliated against for any such speech.  Based on the scant evidence presented to

the court, Defendants' motion for summary judgment must be granted as to Plaintiff's

First Amendment claim.

### 5.  Fifth Amendment

Plaintiff also alleges that Defendants violated the Fifth Amendment through their

conduct.  But, the Fifth Amendment applies only to causes of action against federal

authorities.  *Scott v. Clay County, Tenn.*, 205 F.3d 867 (6th Cir. 2000); 42 U.S.C. §

1983.

## C.  Conspiracy Claim Under 42 U.S.C. § 1985(3) And Equal Protection Challenge

## Under 42 U.S.C. § 1983

Plaintiff claims that Defendants "conspired to deny [him] the rights, privileges, and immunities, and equal protection of the laws . . . in violation of 42 U.S.C. Section 1985(3)."  (Pl.'s Am. Compl. at ¶ 77.)  Section 1985 identifies three ways in which individuals may conspire to interfere with the civil rights of others.  42 U.S.C. § 1985.  Under § 1985, it is unlawful for two or more individuals to (1) prevent a government official from performing his or her duties, (2) obstruct justice by intimidating a party, witness or juror, or (3) deprive persons of their rights and privileges.  *Lindsey v. Allstate Ins. Co.*, 34 F.Supp.2d 636 (W.D. Tenn.1999).  Section 1985(3) states in relevant part:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; . . . in any case of conspiracy set forth in this section, if, one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for  the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3).

The Sixth Circuit has adopted the intracorporate conspiracy theory which posits that a corporation cannot conspire with itself.  *Doherty v. American Motor Corp.*, 728 F.2d 334, 339 (6th Cir. 1994) (a corporation cannot conspire with itself any more than a

private individual can, and it is the general rule that the acts of the agent are the acts of the corporation).  *Id.*

Plaintiff acknowledges that at the time of the incident at issue, all individual Defendants were police officers employed by the City of Hazel Park, and that they were acting within their authority as police officers.  As such, the City of Hazel Park, a municipal corporation, cannot conspire with other parts of the corporate body, such as agents like the police officers it employees.  *Id.*

Likewise, Plaintiff's claim against the city of a conspiracy under 42 U.S.C. § 1983 fails pursuant to the intracorporate conspiracy theory.

### D.  State Law Claims

### 1.  City of Hazel Park's Absolute Immunity From Tort Liability

In their "Motion to Dismiss . . . ," Defendants argue that the City of Hazel Park, as a governmental agency, engaged in a governmental function – the provision of police services – is absolutely immune from tort liability unless the acts complained of fall within [certain] statutory exceptions."  Mich. Comp. Laws § 691.1407(1).  There are four categories of activity for which tort liability may be imposed:  "All governmental agencies, both state and local are statutorily liable for (1) bodily injury and property damage arising out of the failure to keep their highways in reasonable repair; (2) the negligent operation of a government-owned motor vehicle by the agency's officer, agent, or employee; (3) and dangerous or defective conditions in public buildings under the agency's control.  (4) In addition, the state and its agencies, departments, and

25

commissions are liable when engaged in a proprietary function." *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 648-49 (Mich. 1984).

Plaintiff has not pled any statutory exception. Therefore, Plaintiff's tort claims against the City of Hazel Park for tort liability will be dismissed for failure to state a claim.

### 2.  Conduct and Gross Negligence Standard

The Defendant officers were acting in the scope of their employment as Hazel Park police officers at the time that this incident occurred. As such, they are immune from tort liability as long as their conduct did not rise to the level of gross negligence, as statutorily defined. Mich. Comp. Laws § 691.1407(2). Mich. Comp. Laws § 691.1407(2) defines gross negligence as "conduct so reckless as to demonstrate a substantial lack of concern for whether injury results." Mich. Comp. Laws § 691.1407(2).

Plaintiff alleges that Defendant Officers and Sergeant Martin Barner "manifested a substantial lack of concern for whether Plaintiff . . . was injured." (Pl.'s Compl. at ¶ 85.)

Based on the evidence described above and the court's excessive force analysis, there is no issue of fact showing that the officers' conduct rose to the level of gross negligence.

### 3.  Intentional Infliction of Emotional Distress (IIED)

To establish a claim of intentional infliction of emotional distress under Michigan law, the plaintiff must show: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Bernhardt v. Ingham*

26

*Regional Med. Ctr.,* 641 N.W.2d 868, 870 (Mich. Ct. App. 2002).  Conduct is extreme and outrageous only if it "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community."  *Id.*  Liability for the intentional infliction of emotional distress does not extend to mere insults, indignities, threats, annoyances, petty oppressions and other trivialities.  As an initial matter, the court determines whether the conduct at issue may be regarded as so extreme or outrageous to permit recovery.  *Teadt v. Lutheran Church Missouri Synod,* 603 N.W.2d 816, 824 (Mich. Ct. App. 1999).

Plaintiff's intentional infliction of emotional distress claim fails as a matter of law.  Plaintiff claims that "by misusing their positions of authority as [p]olice [o]fficers in falsely arresting and imprisoning Plaintiff . . . without probable cause and in subjecting Plaintiffs to unreasonable, unnecessary, and excessive force while and/or recklessly, engaged in conduct which was extreme, outrageous, and beyond the bounds of decency in a civilized society."  (Pl.'s Am. Compl. at ¶ 89.)

Upon examining the record and construing the evidence in a light most favorable to the Plaintiff, the court finds insufficient evidence for a reasonable jury to conclude that Defendant's conduct was "extreme and outrageous."  *Bernhardt,* 641 N.W.2d at 870.

In *Tope v. Howe*, 445 N.W.2d 452 (Mich. Ct. App. 1989)*,* the court dismissed the plaintiff's action where there was no evidence of the officer's intent to cause the requisite distress.  *Id.* at 460.  Likewise, in the instant case, Plaintiff has presented no evidence that the Defendant officers *intended* to cause Plaintiff the distress he allegedly

27

suffered.  The evidence presented shows that the officers sought to detain Plaintiff in order to further their investigation into the armed robbery that took place at Value Carpet.

Defendants' motion for summary judgment on Plaintiff's IIED claim is granted.

### 4.  False Arrest/Imprisonment

In his amended complaint, Plaintiff claims that the "purported warrant of arrest under which defendant police officer assumed to act was and still is void for the reason that [he] was not identified as the suspect of a crime by the victim during a show up on the scene." (Pl.'s Am. Compl. at ¶ 62.)  Plaintiff also claims that Defendant Officers Viviano, Boucher, Pence, Detective Lowry, and Sargeant Barner, accomplished the detention, arrest, and handcuffing by actual physical force of by an express or implied threat of force." (*Id.* at ¶ 63.)  Plaintiff asserts that Defendant Officers and Sargeant Martin Barner "intended to deprive Plaintiff Francis Turner of his personal liberty or freedom of movement" by "falsely, illegally, and wrongfully arrest[ing] [P]laintiff and handcuff[ing] him." (*Id.* at ¶ 64, 67.)

In order to prevail on a claim of false arrest or false imprisonment, the plaintiff must show that the arrest was not legal, i.e., that it was made without probable cause. *Tope*, 445 N.W.2d at 459.  A police officer, acting in good faith with probable cause within the scope of his authority, is not liable for false arrest or false imprisonment even though the arrest is subsequently found to be baseless.  *Blackman v. Cooper*, 280 N.W.2d 620, 622 (Mich. Ct. App. 1979).  Given the evidence provided to the court, and detailed above, the officers had probable cause to arrest Plaintiff.  Defendants' motion

28

for summary judgment relating to Plaintiff's claim for false arrest/imprisonment is granted.

### 5. Assault and Battery Claims

An assault is defined as "any intentional unlawful offer of corporal injury to another person by force, or force unlawfully directed toward the person of another, under circumstances which create a well-founded apprehension of imminent contact, coupled with the apparent present ability to accomplish the contact." *Espinoza v. Thomas*, 472 N.W.2d 16, 21 (Mich. Ct. App. 1991). A battery is the "wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact." *Id.* at 21. In addition, the *Espinoza* court held that "the protection of the interest in freedom from unintentional and unpermitted contacts with the plaintiff's person extends to any part of his body or to anything which is attached to it and practically identified with it." *Id.*

Governmental actions which would normally constitute intentional torts are protected by governmental immunity if those actions are justified. Conversely, if the actions are not justified, they are not protected by governmental immunity. *Brewer v. Perrin*, 349 N.W.2d 198, 202 (Mich. Ct. App. 1984). In order to support a claim for assault and battery, the amount of force used must have been unlawful. Specifically, a police officer may use reasonable force when making an arrest. *Id.*; *Delude v. Raasakka*, 215 N.W.2d 685, 688 (Mich. 1974); *People v. Krum*, 132 N.W.2d 69, 72 (Mich. 1965). "'The measure of necessary force is that which an ordinarily prudent and

29

intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'"  *Brewer,* 349 N.W.2d at 202.

In evaluating a claim of unreasonable force, the court notes that "police officers are employed to work in a 'milieu of criminal activity where every decision is fraught with uncertainty.'"  *White v. Beasley*, 552 N.W.2d 1, 5 (Mich. 1996) (quoting *Ezell v. Cockrell*, 902 S.W.2d 394, 398 (Tenn. 1995).

Plaintiff's neighbor, Brenda Kendall, stated in her deposition that Plaintiff was trying to break away from Officer Viviano and that the two were "tussling."  (Kendall Dep. at 12-13.)  Kendall also testified that she "was trying to keep the younger people and the kids in order, because they were hollering and screaming and crying at that time.  (*Id*. at 16.)  Based on the evidence presented,  a reasonable jury would have to conclude that the scene was chaotic and the evidence could only support a finding that the officers used force reasonably necessary to effectuate their intended (and legitimate) restraint of Plaintiff.  No reasonable jury could find that Plaintiff did not resist the officers–his own witnesses validate that point. Defendants' motion for summary judgment as to Plaintiff's claim of assault and battery is denied.

## IV.  CONCLUSION

IT IS ORDERED that Defendants' "Motion to Dismiss Or, In the Alternative, [Motion For] Summary Judgment" [Dkt. # 18] as to each of Plaintiff's causes of action-- assault and battery, Fourth Amendment claims against the City of Hazel Park and Defendant officers brought pursuant to 42 U.S.C. § 1983, violation of the Michigan Constitution claims against the City of Hazel Park and Defendant officers, false

arrest/imprisonment, failure to train, conspiracy claims against Defendant Officers

brought pursuant to 42 U.S.C. §§ 1983 and 1985, gross negligence, and intentional

infliction of emotional distress --is GRANTED.

                        S/Robert H. Cleland

                        ROBERT H. CLELAND

                        UNITED STATES DISTRICT JUDGE

Dated:  July 15, 2005

I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, July 15, 2005, by electronic and/or ordinary mail.

                        S/Lisa G. Teets

                        Case Manager and Deputy Clerk

                        (313) 234-5522